## Illinois Steel Company v. Michael Laughran.

### Gen. No. 4,833.

MASTER AND SERVANT—*for what defects in machinery master not liable.* A master is not responsible to his servant for latent defects in machinery or appliances used in his business of which he has no knowledge or means of knowledge. No defect is latent which an inspection will disclose. But it will not be presumed, in the absence of proof, that an inspection will disclose an apparently latent defect.

Action in case for personal injuries. Appeal from the Circuit Court of Will County; the Hon. DORRANCE DIBELL, Judge, presiding. Heard in this court at the April term, 1907. Reversed. Opinion filed October 10, 1907.

JOHN H. GARNSEY, for appellant; KNAPP, HAYNIE & CAMPBELL, of counsel.

JOHN W. D'ARCY, for appellee.

· MR. PRESIDING JUSTICE WILLIS delivered the opinion of the court.

This was an action on the case brought by Michael Laughran against the Illinois Steel Company to recover damages for injuries claimed to have been sustained by him while in the employ of appellant as a fireman.

The declaration contained four counts and averred in substance appellant's failure to furnish appellee with a reasonably safe place in which to work and reasonably safe appliances; and its negligence in permitting certain steam boilers to be operated while in a worn and unsafe condition, and in its failure to have said boilers properly inspected, and in permitting an excessive pressure of steam to collect in said boilers. Appellant pleaded the general issue. There was a trial and a verdict for appellee for $4,500, a motion for a new trial which was overruled, judgment was entered on the verdict, and the company appealed.

The evidence shows that on the 15th of April, 1906, appellant operated steel mills in Joliet, Illinois. No. 1 boiler house at its plant contained seven boilers, and No. 2 where the accident occurred, ten. These ten were placed in two rows of five each, facing each other, and bricked in. The rows were about thirty feet apart. The whole seventeen were connected in the same battery, discharging their steam into an eighteen-inch feed pipe or header, and were fed from the same fuel supply, which was the waste gas from blast furnaces, brought in a five foot pipe which passed between the rows of boilers about fourteen feet from the ground. From this twenty-four and thirty-six inch pipes led to each boiler,

28

and the gas burned on a burner five inches wide and three feet long, underneath them. These were Sterling boilers about fifteen feet square, and eighteen feet high, of the same size and style, being what is known as a water tube boiler, that is, the water and steam were inside the two hundred and eighty vertical flues, four and a half inches in diameter and about eighteen feet high, made of boiler iron, three-sixteenths of an inch thick. In making these tubes, the edges were scarfed down, lapped, and then welded together. There were also five drums where the steam collected, connected by thirty-two circulating tubes. Each boiler was provided with two safety valves four inches in diameter set at one hundred and fifty pounds blowing off pressure. In the engine room, whose engines were supplied from these boilers, was a Bristol recording guage which was accurate and showed the pressure of three pounds less than the guage on the boilers. There were levers on each boiler by which its supply of gas could be shut off, and there were three ways other than by the safety valves by which the steam pressure could be reduced; by supplying the boilers with cold instead of hot water, by opening the furnace doors, and by opening valves in the pipes that fed gas to the boilers, known as bleeders. This latter was the handiest way of reducing steam. Appellee was a fireman in No. 2 boiler house, and as such was required to look after the fire boxes and keep them clean, under the direction of William Sealey, the water tender. On the night of April 15, 1906, appellee in course of his work was sent out two or three times by Sealey to open the bleeders, and the last time he went out he was told by Benson, foreman of the blast furnaces, not to open them any more. At about a quarter past one o'clock in the morning, as he was coming down the boiler house, when opposite boiler No. 9, one of its two hundred and eight tubes burst, throwing hot water, steam and other material upon appellee, and injuring him. Upon examination, a break, eighteen or twenty inches long and eight or nine inches wide, was found in one of the flues where it was welded, about two and a half feet from

the top.   It appeared from this examination that the edges of the weld had united but that the center had not.

At the close of all the evidence, appellant moved the court to exclude the evidence and direct the jury to find appellant not guilty.   This motion, and the instruction based thereon the court denied, on which ruling appellant now relies for the reversal of this judgment, and in support of its contention urges that appellee's injury was the result of the risk assumed because of his employment.

Jesse Brown, a witness called by appellee, testified that he was a boiler maker of twenty-five or thirty years' experience; that he was familiar with water tube boilers; that they were in common use and their use increasing because they were a better boiler; that if a Sterling boiler, such as the one in question, was used night and day it should be inspected every two or three months by a boiler maker or a man that understood inspection, who should go over it with a hammer and examine it thoroughly; that the tubes of a boiler have to be taken out sometimes every year, year and a half or two years. If the tube had run for several years at a working pressure of one hundred and twenty-five or one hundred and fifty pounds without showing any leak, it would indicate that there was no defect in it.   If there was no defect or jar, and the tube stood a cold water test of fifty or one hundred pounds more than the working pressure, there is no way in which one could find out about the weld.   If the boiler had been inspected by the cleaners with a light and no leaks were ascertained, it was fit to be fired up, if the cleaners were competent men.   If it had been given a regular inspection within a month it would be all right.   James Sparrow testified that he was inspector for the Casualty Company of America; that he inspected this boiler March 14, 1906, and found everything in good condition; that there was no way in which this defect in the tube that burst could be detected; that it was on the inside of the weld; that the ordinary life of a tube in a boiler of this type ought to be eight or nine years; that water tube boilers were in general use and their use increasing because they were better than tubular boilers, ap-

pearing to be more safe; that if a tube was hammered while a five hundred pound test was on, a defect would show up, but the tube would not be fit to use because that would tend to damage the structure of the steel. Robert Worcester testified that he was boiler inspector for appellant at the time of the accident and inspected this boiler eight days before; that he went into the boiler with a torch and hammer, looked it all over, tapped the head and flues and examined them and the drums and head, and got underneath and cleaned off the floor; that there was nothing wrong that he could see at all; he found it in good shape. Mason, appellant's steam engineer, testified that this boiler had been in service about two years and four months; that he was present when it was erected and accepted the boiler for the company; that it then stood a hydraulic test of two hundred and twenty-five pounds and showed no leaks or defects; that the average life of a tube, placed as this one was, was ten or fifteen years or as long as the boilers; that the Bristol recording pressure guage showed the pressure on the night of the accident to have been one hundred and fifty-two pounds at half past twelve, one hundred and fifty pounds at one o'clock, and from one hundred and fifty to one hundred and forty until two; that under the U. S. regulations, it was safe at one hundred and fifty-nine or one hundred and sixty pounds. Whalen, superintendent of appellant's boiler service, testified that there had been no defects reported on this boiler; that such a defect could not be disclosed by an inspection; that the boiler did not burst because of too much steam pressure, but because there was a defect in the flue and the pressure caused it to open.

It is clear from the evidence that this boiler was erected and accepted by the company two years and four months prior to the accident, when it stood a test of two hundred and twenty-five pounds without showing any leak or defect; that it was inspected by the inspector for the insurance company March 14, 1906, and by appellant's inspector, eight days before the accident, neither of whom found any defects; that under the U. S. regulations it was safe at one hundred

and fifty-nine or one hundred and sixty pounds pressure; that the pressure on the night of the accident was one hundred and fifty-two pounds, at half past twelve, one hundred and fifty pounds at one o'clock varying from one hundred and fifty to one hundred and forty pounds from one until two; that the accident occurred at about a quarter past one.

In our opinion, the evidence fails to show that the explosion resulted from an unusual, excessive and unsafe quantity of steam or from the fact that the boiler was operated while in a worn and unsafe condition, but because of the defect in the weld of the tube, which it does not appear was of such character that appellant by the use of ordinary care or diligence could or ought to have discovered it; and appellant was not chargeable with want of ordinary care in not knowing of its existence and guarding against its consequences; the rule being that the master is not responsible to his servant for latent defects in the machinery or appliances used in the business, of which he has no knowledge or means of knowledge. Sanden v. Bannon, 85 Ill. App., 17. Employers, whether individuals or corporations, are not insurers of their employees as against injury from pure accident arising in their regular line of employment. There is nothing in the evidence in this record showing the slightest neglect of duty on the part of appellant, as it appears that the usual and ordinary tests for determining the safety of the boiler were inadequate to discover the defect, as the evidence shows that it could not have been discovered without taking out all the tubes and hammering them under excessive pressure. This would have materially injured the boiler, and so damaged the structure of the steel of the tubes as to have rendered them unfit for use. Adopting the language of the Supreme Court, with but slight variation, appearing in Sack v. Dolese, 137 Ill., 133, if plaintiff had shown the fault in the flue was known to appellant through its servants, but unknown to himself, he would have made out his case, and, so too, he would have made his case had he shown the defect was of such a nature that it would have been known to them if they had exercised due care. No defect is latent which an in-

spection will disclose, hence appellant would be charged with knowing what an inspection would inform it of, but before the court or jury can say that appellant's negligence in failing to inspect the boiler was the cause of appellee's injury, it must be shown by the evidence that the fault or defect in the flue was one which a proper inspection would have made known to appellant. This, the Supreme Court says, is true in principle and very clearly established by authority. We are of the opinion that the evidence does not establish the negligence charged in the declaration and that the court should have sustained the motion to exclude the evidence and direct a verdict for appellant.

The judgment is therefore reversed.

*Reversed, with finding of facts.*

Finding of facts, to be incorporated in the judgment of the court: We find that appellee was injured by a risk of his employment, which he assumed, and that appellant was not guilty of negligence.

Mr. Justice Dibell having presided at the trial of this case in the lower court, took no part in its decision here.